

# In the
# Court of Appeals
# Sixth Appellate District of Texas at Texarkana

---

No. 06-22-00052-CR

---

JONATHAN FULTON SMITH, Appellant

V.

THE STATE OF TEXAS, Appellee

---

On Appeal from the 102nd District Court
Red River County, Texas
Trial Court No. CR03054

---

Before Stevens, C.J., van Cleef and Rambin, JJ.
Memorandum Opinion by Justice van Cleef

## MEMORANDUM OPINION

A Red River County jury convicted Jonathan Fulton Smith of capital murder and assessed a sentence of life imprisonment without the possibility of parole. In his sole point of error, Smith argues that the evidence is legally insufficient to support the jury's verdict of guilt. We disagree and affirm the trial court's judgment.

## I.        Standard of Review

"In evaluating legal sufficiency, we review all the evidence in the light most favorable to the trial court's judgment to determine whether any rational jury could have found the essential elements of the offense beyond a reasonable doubt." *Williamson v. State*, 589 S.W.3d 292, 297 (Tex. App.—Texarkana 2019, pet. ref'd) (citing *Brooks v. State*, 323 S.W.3d 893, 912 (Tex. Crim. App. 2010) (plurality op.); *Jackson v. Virginia*, 443 U.S. 307, 319 (1979); *Hartsfield v. State*, 305 S.W.3d 859, 863 (Tex. App.—Texarkana 2010, pet. ref'd)). "Our rigorous [legal sufficiency] review focuses on the quality of the evidence presented." *Id.* (citing *Brooks*, 323 S.W.3d at 917–18 (Cochran, J., concurring)). "We examine legal sufficiency under the direction of the *Brooks* opinion, while giving deference to the responsibility of the jury 'to fairly resolve conflicts in testimony, to weigh the evidence, and to draw reasonable inferences from basic facts to ultimate facts.'" *Id.* (quoting *Hooper v. State*, 214 S.W.3d 9, 13 (Tex. Crim. App. 2007) (citing *Jackson*, 443 U.S. at 318–19; *Clayton v. State*, 235 S.W.3d 772, 778 (Tex. Crim. App. 2007))).

"Legal sufficiency of the evidence is measured by the elements of the offense as defined by a hypothetically correct jury charge." *Id.* at 298 (quoting *Malik v. State*, 953 S.W.2d 234, 240

(Tex. Crim. App. 1997)). "The 'hypothetically correct' jury charge is 'one that accurately sets out the law, is authorized by the indictment, does not unnecessarily increase the State's burden of proof or unnecessarily restrict the State's theories of liability, and adequately describes the particular offense for which the defendant was tried.'" *Id.* (quoting *Malik*, 953 S.W.2d at 240).

Here, the State alleged that Smith committed capital murder by "intentionally caus[ing] the death of an individual, namely Jessica Lynn Clark Walling, by smoke inhalation, and the defendant was then and there in the course of committing or attempting to commit the offense of arson of a habitation which was occupied by Jessica Lynn Clark Walling." Smith argues that "there was no legally sufficient evidence [he] intentionally star[t]ed the fire that caused Walling's death."

## II. The Evidence at Trial

On August 3, 2018, a fire burning Walling's home lit the dark sky. Mark Gable, a patrol officer for the Bogota Police Department, testified that he was travelling in his patrol unit when he saw "a glow in the sky and some smoke." He drove towards a blazing fire and, at 12:36 a.m., told dispatch to "call the fire department for a house fire." Gable testified that fire "already blew out the bay window on the front . . . and it was vented through the roof." Because the fire was "too intense" for Gable to enter the home, he screamed to see if anyone was inside, but heard no response. Soon after, the Bogota Volunteer Fire Department (BVFD) recovered the bodies of Walling and her ten-year-old son, Chevy, from the blaze.

Craig Eudy, a member of the BVFD, responded to the dispatch. He testified that the bay windows were by the front door and that "[t]he main extent of the fire was right around the

3

windows' drapes that had been melted." Eudy opined that the fire traveled up the makeshift drapes, composed of fuzzy blankets, hit the ceiling, burned through the ceiling, and continued to the attic and roof. According to Eudy, the living room and attic roof sustained the most damage, and "there was no fire" in the kitchen, which had sustained smoke damage.

Eudy testified that he found Walling lying on her back in the kitchen with nothing on top of her. Gable noted that "[t]here was soot caked around [Walling's] mouth and nose." Eudy also found Chevy next to the bathtub with "both faucets still running." Walling and Chevy were pronounced dead at the scene.

Dr. Amy Gruszecki, a forensic pathologist, testified that Walling's and Chevy's autopsies revealed that they had died of carbon monoxide poisoning due to smoke inhalation, which indicated that they were alive during the fire. Gruszecki also testified that Walling had sustained other injuries anywhere from "[i]n and around the time of death" to "[w]ithin about 24 hours" of her death. Walling had a subscalpular hemorrhage, which Gruszecki described as "a bruise to the front of the scalp" or a "big area of hemorrhage underneath the scalp" due to blunt force trauma. Gruszecki said that the bruising indicated Walling was alive when she sustained the trauma to her head. Gruszecki also found that Walling had a bleeding cervical spinal fracture that was also sustained before death.[1] Her manner of death was ruled "undetermined."

Paul Allen Steelman, a fire and arson investigator for the Texas State Fire Marshall's Office, concurred with Eudy's conclusion that the living room had sustained the most damage. The front door, which opened into the living room, had "very deep charring." Its panels were

---

[1]Walling's toxicology report showed that she had taken methadone and smoked marihuana.

4

consumed, the dead bolt did not appear to be locked, and the door had collapsed inward. While Steelman could not pinpoint the point of origin of the fire, he testified it was in or near the "west wall of the living room or the window." According to Steelman, photographs of electrical cords and an electrical plug were sent to Kelly Stalder, an engineer with the Texas State Fire Marshall's Office. Stalder could not determine "whether or not the fire was electrical in nature."[2] Steelman testified that an accelerant-sniffing K-9 unit was brought to the scene but that nothing suggested accelerants were used to start the fire. He added, "[A] K-9 that doesn't alert can mean there's not an accelerant there or the accelerant has evaporated to the point the K-9 can't detect it." As a result of a lack of evidence, the cause of the fire was undetermined, and Steelman said he "found no evidence that the fire was intentionally started."

During his investigation, Steelman came across a cell phone. Ha Nguyen, an officer in the Digital Forensics Unit of the Fort Worth Police Department, testified that he received the cell phone found by Steelman and was tasked with analyzing it. Nguyen said that the phone belonged to Walling and that he was able to retrieve her text messages. The data Nguyen retrieved showed that, before her death, Walling received and read several messages from Smith's phone number, which was assigned "the contact name of Jon" in Walling's phone. In the following chart, we include the relevant messages between Smith and Walling, which show Smith was at Walling's house just before the fire:

---

[2] Stalder testified that she saw no evidence of electrical arching or an electrical cause for the fire from the photographs Steelman submitted but could not "rule out a possible electrical source of ignition" without more information. Yet, she testified that an electrical fire would likely smolder for a while and would "not immediately consume an entire room" without making "contact with something that [would] combust," like "gasoline vapor."

5

| Date | Time | Sender | Message |
|---|---|---|---|
| 8/2/2018 | 10:00 p.m. | Smith | "Hay" |
| 8/2/2018 | 11:46 p.m. | Walling | "Don't text me again or my bfriend will beat the shit outtavu" |
| 8/2/2018 | 11:48 p.m. | Smith | "I wish he would.. I'll make him my bitch and make you watch" |
| 8/2/2018 | 11:50 p.m. | Smith | "But seriously lol I'll make both of y'all's lives in living nightmare I just wanted to say hi" |
| 8/2/2018 | 11:56 p.m. | Smith | "Can I come by for a few minutes and smoke one with you" |
| 8/3/2018 | 12:01 a.m. | Smith | "If you're there by yourself I'll come by and give you some weed and visit for a second cool" |
| 8/3/2018 | 12:04 a.m. | Smith | "Please it's totally cool let me come give you some smoke you are still my friend " |
| 8/3/2018 | 12:09 a.m. | Walling | "Hell no. I got a man. A good man. Hes coming n tomm from working out of town . . . . I'm not ur friend" |
| 8/3/2018 | 12:09 a.m. | Smith | "You forget who I am you piece of shit whore I will make him disappear LOL in two shakes of a cat's Bobtail" |
| 8/3/2018 | 12:11 a.m. | Smith | "You don't have to be scared nobody knows I'm talking to you and nobody knows if I come by and give you some weed . . . so if you don't want none tell me now and I'll leave you alone if not I'll bring you some just because" |
| 8/3/2018 | 12:14 a.m. | Walling | "Yes I want some" |
| 8/3/2018 | 12:15 a.m. | Walling | "He has some. Hell just give it to me n the morning. Thanks tho" |
| 8/3/2018 | 12:15 a.m. | Smith | "I will be by in within the next 10 to 15 minutes okay" |
| 8/3/2018 | 12:16 a.m. | Walling | "Ok" |
| 8/3/2018 | 12:25 a.m. | Smith | "I'm at your front door"[3] |
| 8/3/2018 | 12:31 a.m. | Walling | "Come by tomm and ill pay u. Ok. Im sorry" |
| 8/3/2018 | 12:31 a.m. | Smith | "You're dead" |
| 8/3/2018 | 12:32 a.m. | Walling | "I dont want a scene herew . . . I'll pay u tomm morning" |
| 8/3/2018 | 12:33 a.m. | Walling | "Dont send threats Jon ok. Ill pay u tomm" |
| 8/3/2018 | 12:33 a.m. | Smith | "…you are one sorry individual and you got something coming to you you better leave town . . . I was going to give you some you do not have to rip it out of my hands . . . Are you going to pay all right in fact I'm going to turn around and you need to come out here and suck my dick" |
| 8/3/2018 | 12:35 a.m. | Smith | "either way I got you on my messages wanting marijuana so guess what say goodbye to your . . . kiddos . . ." |

---

[3]Another message between Walling and her boyfriend, Chris, showed that Walling texted Chris at 12:30 a.m., stating, "Jon that idiots here. He just left. I csnt [sic] stand him."

| | | | |
|---|---|---|---|
| 8/3/2018 | 12:39 a.m. | Smith | "when your old man gets in I'm going to come over and making my bitch while you watch" |
| 8/3/2018 | 12:54 a.m. | Smith | "I just heard the scanners what . . . is going on. Oh my God" |
| 8/3/2018 | 12:55 a.m. | Smith | "Are you okay. . . . Was it the old wiring" |

According to Nguyen, messages sent to Walling by Smith and others after 12:34 a.m. were never read by her.[4] Based on his experience, Nguyen opined that Smith's last two messages to Walling were simply "[f]eigning concern."

Dustin San Jule, a sergeant with the Bogota Police Department (BPD), testified that he knew Walling, who once told him that she was in a relationship with Smith. Jackie Clark, Walling's mother, described Walling and Smith's relationship as "on and off." Smith's wife, Roxanne Nicole Smith, testified that she and Smith, who was "one of [her] best friends," lived as "[r]oommates" rather than as husband and wife. Roxanne believed Smith and Walling were dating before and during August 2018 and said that Smith was "looking at pictures of engagement or wedding rings" for Walling.

Jule testified (1) that the BPD had a police cell phone used to receive calls and text messages, (2) that Walling had called the police cell before, and (3) that, on February 21, 2018, she texted, "Jon is threatening to burn my house down so watch my place." Clark testified that she was aware that Walling smoked marihuana, and Clark once served as a conservator to Wallings's children after Child Protective Services opened an investigation into Walling's drug use.

---

[4]Jerry Hutson, chief of the BVFD, testified that the fire was subdued at 1:50 a.m.

When Steelman was presented with Smith's threats and text messages, the following occurred during his testimony:

Q. Okay. Let me ask you this. Do you look at things that someone has threatened to burn someone's house down? Would that be taken into consideration in a situation like this where you're not finding any accelerants?

A. If I knew -- if that information was made available to me, yes.

Q. Okay. If someone had had an altercation with the person immediately before the fire was discovered might that fall into your thought pattern of, hey, this might be arson?

A. It could, yes.

Q. If someone is found in the house with blunt force trauma to their head and a broken neck might that, coupled with threats, might that be something that you'd look at?

A. I certainly would, yes.

Q. And if someone had sent someone a text message saying, "You're dead" moments before or minutes before the fire is discovered, is that something you would look at, too, in combination with them being found with blunt force trauma to the head and a broken neck and a previous text sent to them or sent saying, "I'm going to burn your house down"?

A. Absolutely, yes.

Q. You weren't aware of any of that information at the time you wrote your report, were you?

A. No, sir, I was not.

. . . .

Q. And if you had the other evidence before you in a case would you determine this to be arson? The evidence I just went over in the hypothetical?

A. If I had all the other evidence that you just played out. . . . I would have to lean strongly toward that, that hypothesis, yes, sir.

8

Q. Of it being arson?

A. Yes, sir.

David Short, chief of the BPD, testified that his suspicions turned to foul play on receipt of Walling's autopsy report. Short said he spoke with people who knew Walling and soon came to suspect Smith. Short interviewed Smith, who made statements about the night of Walling's death that were inconsistent with the text messages he had sent to her, including that he and Walling "were getting along fine" and that he did not threaten her. Smith said that he was very intoxicated on the night of Walling's death and claimed to not "remember anything" at times but was specific about other details, such as what route he took to travel to Walling's home. Smith said he left after Walling stole his marihuana and asked him to go. He later told Short that Walling locked the door behind her, but Short knew that the dead bolt on the front door was not engaged. Contrary to his text messages, Smith said that he told Walling not to worry about paying him for the marihuana and that he and Walling "were texting each other long after [he] left."

Short continued to discover irregularities in Smith's interview. Smith claimed he had an alibi, Arlie Elrod, who was allegedly with him during the time of the fire, but Short's interviews with Elrod led him to disbelieve Smith's claim. According to Short, Smith initially said that he did not hear about the fire until later that morning, but then said both that he discovered the fire while driving around and when he heard about it on a police scanner. Short testified that he interviewed Roxanne, who said that she and Short did not own a police scanner. Roxanne also led Short to disbelieve Smith's claim that he was not romantically interested in Walling because

9

he was getting back together with Roxanne. Critically, even though Short did not reveal any information suggesting that Walling suffered blunt force trauma before her death, Smith volunteered a statement that he "didn't beat up anybody."

After hearing this evidence, the jury rendered a verdict of guilt.

### III.    Sufficient Evidence Supported the Jury's Finding of Guilt

Smith was indicted under Section 19.03(a)(2) of the Texas Penal Code, which elevates a murder to capital murder if "the person intentionally commits the murder in the course of committing . . . arson." TEX. PENAL CODE ANN. § 19.03(a)(2) (Supp.). A person commits arson if he starts a fire or "causes an explosion with intent to destroy or damage . . . [a] habitation" while "knowing that it is located on property belonging to another." TEX. PENAL CODE ANN. § 28.02(a)(2)(D). Because the State alleged that Smith intentionally caused Walling's death, and Walling died of smoke inhalation, the record must disclose legally sufficient evidence to support a conclusion that Smith intentionally started the fire. Citing to a lack of direct evidence, Smith argues that nothing showed he intentionally set the fire. We conclude that, when the evidence is viewed in a light most favorable to the verdict, a rational jury could conclude that Smith had the intent to kill Walling and did so by intentionally starting the fire that consumed Walling's home and caused her death.

Smith's argument relies on two premises, (1) that "the mere fact that a building is destroyed by fire does not show that the crime of arson was committed by anyone, in that there must be evidence that the fire was of an incendiary origin," *Faulk v. State*, 608 S.W.2d 625, 627 (Tex. Crim. App. 1980), and, (2) that "motive and opportunity alone are not sufficient to

10

demonstrate that a fire was an arson committed by the defendant," *Hacker v. State*, 389 S.W.3d 860, 870 (Tex. Crim. App. 2013). *See Massey v. State*, 226 S.W.2d 856, 859 (Tex. Crim. App. 1950); *Wheeler v. State*, 35 S.W.3d 126, 134–35 (Tex. App.—Texarkana 2000, pet. ref'd). In *Hacker*, the Texas Court of Criminal Appeals explained that, while "[e]vidence of motive [and opportunity] helps link a defendant to wrongful conduct or is supportive of other evidence of such conduct," "without evidence that wrongful conduct has occurred, there is nothing for motive and opportunity evidence to link the defendant to."[5]  *Hacker*, 389 S.W.3d at 871. To further explain this Rule, *Hacker* used the following example:

> If, for example, John has a motive for murdering Mary, but there is no evidence that Mary is dead (much less evidence that her death was a homicide), then John's motive is meaningless. His motive alone does not establish that a murder occurred, and the motive cannot link John to a murder without evidence that there was a murder.

*Id.* As we explain below, the logical force of the evidence in this case is sufficient to meet the requirement of *Hacker* and *Faulk*, because it permitted a rational jury to find not only that Smith had the motive and opportunity to murder Walling, but that a murder was committed and accomplished when Smith intentionally set fire to Walling's home.

During our analysis, we consider "events occurring before, during and after the commission of the offense and may rely on actions of the defendant which show an understanding and common design to do the prohibited act." *Hooper*, 214 S.W.3d at 13 (quoting *Cordova v. State*, 698 S.W.2d 107, 111 (Tex. Crim. App. 1985)). It is not required that each fact

---

[5]We note that Smith's briefing discusses the *corpus delicti* doctrine, which applies to cases involving extrajudicial confessions. *Harrell v. State*, 620 S.W.3d 910, 914 (Tex. Crim. App. 2021). Because there is no extrajudicial confession in this case, we need not "blend[] aspects" of the *corpus delicti* doctrine into our legal sufficiency analysis. *Id.*

11

"point directly and independently to the guilt of the appellant, as long as the cumulative force of all the incriminating circumstances is sufficient to support the conviction." *Id.* "Circumstantial evidence and direct evidence are equally probative in establishing the guilt of a defendant, and guilt can be established by circumstantial evidence alone." *Paroline v. State*, 532 S.W.3d 491, 498 (Tex. App.—Texarkana 2017, no pet.) (citing *Ramsey v. State*, 473 S.W.3d 805, 809 (Tex. Crim. App. 2015); *Hooper*, 214 S.W.3d at 13 (citing *Guevara v. State*, 152 S.W.3d 45, 49 (Tex. Crim. App. 2004))).

The evidence showed that Smith and Walling were involved in a romantic relationship serious enough for Smith to contemplate purchasing an engagement ring for her. At some point, Smith and Walling broke up, and six months before the fire, Smith "threaten[ed] to burn [Walling's] house down." Walling believed that the threat was significant enough to report it to the BPD.

On the night before Walling's death, text message exchanges showed that Walling and Smith were arguing and that Smith threatened to beat Walling's boyfriend when he learned of him. Despite the argument, Smith offered Walling marihuana and informed her that he was coming to her home. At 12:25 a.m. on the day of Walling's death, Smith texted Walling to tell her that he was at her front door. The evidence, including Smith's interview, showed that Walling opened her door, snatched Smith's marihuana from his hand, and made him leave, which greatly angered Smith. At 12:30, Walling told her boyfriend that Smith had just left her house. One minute later, she apologized to Smith and said she would pay him for the marihuana, but Smith responded, "You're dead," which the jury could have found was an express threat to

12

Walling's life. At 12:33, Smith told Walling that he was returning to her house and intended to make her pay by forcing her to commit a sexual act. That text placed Smith back at Walling's home and, three minutes later, Gable found the home engulfed in flames.

While there is no direct evidence of what happened during the three critical minutes before the house fire, circumstantial evidence supports a finding of guilt. Smith's statement, "You're dead," showed an intent to kill Walling. Walling's autopsy report showed that she had suffered a subscalpular hemorrhage "to the front of the scalp" and a fractured cervical spine. While Gruszecki could not pinpoint the exact time of the severe blunt-force injury, the jury could conclude that Smith inflicted the harm because, before that time, none of Walling's 292 text messages sent from August 1 until her early morning death on August 3 revealed any evidence that she had suffered an injury, and her call logs showed that she did not call emergency services or police after sustaining such a severe injury. When questioned by Short, Smith, who was not provided with any information about Walling's blunt-force trauma, volunteered a statement that he "didn't beat up anybody." As a result, the jury could reasonably infer that Smith knew about Walling's injuries because he had beaten her.

Next, even though Steelman could not determine the cause of the fire, it was not too great an analytical leap for the jury to conclude that Smith intentionally started it. As Smith notes, Steelman said he "found no evidence that the fire was intentionally started," but explained that he could not rule out the possibility that an accelerant was used to start the fire because it was possible that any "accelerant ha[d] evaporated to the point the K-9 [could not] detect it." Steelman testified that the fire started in or near the "west wall of the living room or the

13

window," which was by the front door, and Eudy's testimony supported the theory that the fire could have traveled up the flammable fuzzy blankets that were used as make-shift drapes. The jury could have determined that neither Walling nor her son started the fire because neither were found in the living room.

Instead, the jury could have concluded that Smith intentionally lit the fire to cover up his severe assault of Walling in light of the following: (1) Smith's prior threat to burn down Walling's home; (2) Smith's presence at Walling's house in the critical three-minute period before Gable reported a blazing fire; (3) Steelman's testimony that he would have "lean[ed] strongly toward" arson had he known of the full facts of the case; (4) the immediate, blazing nature of the fire suggesting it was not the result of an electrical issue; (5) Smith's unconvincing alibi; (6) Nguyen's testimony that Smith's last text messages to Walling were simply feigning concern; (7) Smith's inconsistent statements of when he heard of the fire; (8) Smith's claim that he heard about the fire on a police scanner even though Roxanne testified they did not own a police scanner; and (9) Smith's other inconsistent statements to Short. *See King v. State*, 29 S.W.3d 556, 565 (Tex. Crim. App. 2000) (holding that making false statements to cover up crime is evidence indicating consciousness of guilt and is admissible to prove commission of offense).[6]

---

[6]The jury could have determined that Smith lit the fire by using an accelerant, lit the make-shift drapes with an open flame, or started the fire by other means.

14

Because we conclude that the logical force of the evidence, viewed in the light most favorable to the verdict, supported a finding of guilt beyond a reasonable doubt, we overrule Smith's sole issue on appeal.[7]

## IV. Conclusion

We affirm the trial court's judgment.

Charles van Cleef
Justice

Date Submitted: March 8, 2023
Date Decided: March 14, 2023

Do Not Publish

---

[7]By cross-appeal, the State argues that the trial court erred by sustaining Smith's relevance objection to some of Short's testimony. "The [S]tate is entitled to appeal a ruling on a question of law if the defendant is convicted in the case and appeals the judgment." TEX. CODE CRIM. PROC. ANN. art. 44.01(c). It "need not file its own notice of appeal when it raises a cross-point concerning a ruling on a question of law under Article 44.01(c)." *Pfeiffer v. State*, 363 S.W.3d 594, 597 (Tex. Crim. App. 2012). Even so, "[t]he State's right to cross-appeal is limited," *id.* at 601, because we "are without authority to render advisory opinions," *id.* (quoting *Armstrong v. State*, 805 S.W.2d 791, 794 (Tex. Crim. App. 1991)). The State's brief states that its cross-appeal "[m]ay [b]ecome [m]oot" if we find the evidence legally sufficient to support the jury's verdict of guilt. We instead find that we "cannot address a cross-issue 'in which the State merely requests a directive as to language or reasoning of the lower court that does not impact the ultimate decision.'" *Seghelmeble v. State*, 390 S.W.3d 576, 582 (Tex. App.—Dallas 2012, pet. ref'd) (quoting *Pfeiffer*, 363 S.W.3d at 601 n.32); *see Martinez v. State*, 633 S.W.3d 698, 712 (Tex. App.—Houston [14th Dist.] 2021, pet. ref'd). We overrule the State's cross-issue because it seeks an advisory opinion.